389 A.2d 1234.

STATE *v.* AL ECKERT.

JULY 27, 1978.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger, JJ.

BEVILACQUA, C.J.   This is an appeal from an order of the Superior Court denying the plaintiff's motion to adjudge the defendant in contempt for allegedly violating the terms of a preliminary injunction.

This case arises from the morass of transaction surrounding a 10-year leverage funding program used to sell life insurance policies to Rhode Island clients from 1971 through 1975. Several of the corporations involved decided to terminate the program before the end of the 10-year period, and that decision has generated other litigation that has come before this court. *State* v. *Piedmont Funding Corp.*, 119 R.I. 695, 382 A.2d 819 (1978).

Elva Eckert,[1] defendant in this matter, was affiliated with two corporations that were involved in the program. He served as branch manager of the Providence office of the Piedmont Capitol Corporation, and was an agent for the Pacific Fidelity Life Insurance Company. Eckert was licensed to sell insurance in Rhode Island. As part of the leverage funding program, he sold life insurance policies to approximately 100 Rhode Island residents. These program holders paid the premiums on their life insurance policies by taking loans from the Piedmont Funding Corporation. In turn, the loans were secured by mutual funds purchased by the program holders.

In 1973 and 1974 the office of the Attorney General received complaints from several participants in the program. The complaints stated that in selling them insurance

---

[1] It appears from the record in this case that "Elva," rather than "Al," is the proper spelling of the defendant's first name.

policies, defendant made various misrepresentations. As a result of investigations conducted in response to these complaints, defendant's license to sell insurance in Rhode Island was evenutally revoked in February 1976. Prior to this, on July 11, 1975, the Attorney General, on behalf of plaintiff, the State of Rhode Island, filed a complaint seeking injunctive and other relief, alleging that defendant had misrepresented aspects of the leverage funding program to the public and had engaged in unfair and deceptive acts in contravention of the Unfair Trade Practice and Consumer Protection Act, G.L. 1956 (1969 Reenactment) ch. 13.1 of title 6.[2] The defendant answered and filed third party complaints against several corporations involved in the funding program.[3]

On August 12, 1975, a hearing was held concerning plaintiff's petition for a preliminary injunction. At the conclusion of the hearing the trial justice delivered an oral order granting the preliminary injunction. Paragraph one of this oral order enjoined defendant from selling insurance of any form in Rhode Island, while paragraph five enjoined him from contacting, counseling, or advising program participants concerning involvement in the funding program. Attorneys for both parties were present when the oral order was read. The plaintiff contends that there is some dispute about whether defendant was present at that time, although defendant denied being there. The written preliminary injunction, which was prepared by the Attorney General, was

---

[2]Specifically, the plaintiff alleged that the defendant misrepresented the cost of annual premiums, the efficacy of the insurance policies involved, and the benefits of maximizing the loan taken to pay the premiums. The complaint also alleged that the defendant failed to leave prospectuses with the buyers and made certain representations which resulted in the lapsing of some of the policies sold by the defendant under the program.

[3]On July 17, 1975, the defendant lodged third party complaints against Piedmont Management Co., Inc., Piedmont Capital Corp., Piedmont Funding Corp., Pacific Fidelity Life Insurance Company, Lexington Management Corp., Lexington Research Fund, Inc., and Lexington Growth Fund, Inc. All of these complaints were subsequently dismissed.

entered and effectuated as of August 12, 1975. The preliminary injunction was obviously intended to memorialize the oral order. However, there was a discrepancy between the provisions of the oral order and the injuction. The preliminary injunction omitted what was paragraph five of the oral order, the prohibition against contacting, counseling or advising program participants. The defendant received a copy of the preliminary injunction from his attorney, who was aware of the omission.

The plaintiff learned that defendant had been contacting program participants after August 12 in apparent violation of paragraph five of the oral order. At this time plaintiff realized the discrepency between the oral order and the preliminary injunction. As a result on November 14, 1975, plaintiff moved to amend the preliminary injunction of August 12 to include the missing paragraph five as set forth in the oral order of that same date. Until this time, plaintiff obviously felt that defendant was bound by paragraph five. In response to plaintiff's motion to amend, a hearing was held in the Superior Court, the motion was granted, and on November 24 the substance of the heretofore missing paragraph five was reduced to writing and engrafted onto the still outstanding preliminary injunction of August 12. By virtue of the amendment, the modified preliminary injunction of November 24 was, for all practical purposes, made identical to the oral order of August 12.

On December 10, plaintiff asked the Superior Court to adjudge defendant in contempt for violating the proscriptions of paragraphs one and five of the amended preliminary injunction of November 24.[4] In response to the complaint,

[4] The plaintiff alleged that the defendant, acting by himself and through his agent, his wife Nilda N. Eckert, had violated paragraph one by soliciting the sale of and selling insurance in Rhode Island after August 12, 1975. The plaintiff also charged that the defendant had violated paragraph five of the amended preliminary injunction by contacting, counseling, and advising program participants. The plaintiff contended that the defendant and his agent had notice of all the provisions of the preliminary injunction, both oral and written. Thus plaintiff

defendant denied that he had knowledge of the amended injunction at the time he allegedly violated the terms of paragraph five. As to paragraph one, defendant contended that his actions were not contemptuous because they did not involve the sale of insurance in Rhode Island after August 12, 1975.

A hearing was conducted, during which various witnesses testified that they had been contacted by defendant after August 12. Apparently, the premature termination of the leverage funding program resulted in the cancellation of the loans by which participants were paying their insurance premiums. Program holders were notified of this by an agent of the corporation responsible for the loans. This agent also offered to sell the program holders new term insurance policies at considerably lower premiums than the regular life insurance and endowment policies that they had purchased from defendant under the leverage funding program. A number of these policies originally sold by defendant lapsed as a result of the curtailment of funding. Some of the holders of these lapsed policies bought new policies from the agent, while others did not. The defendant then began contacting program holders and continued to do so after August 12, 1975. He advised them to reinstate the lapsed policies that he had originally sold to them. Some of the people contacted by defendant testified that at defendant's behest they did reinstate the lapsed policies.

The trial justice concluded that defendant was not enjoined by paragraph five until he received notice that the preliminary injunction of August 12 had been amended to include that paragraph. Furthermore, the trial justice found no evidence in the record showing that after receiving notice of the November 24 amendment defendant had contacted, counseled, or advised any program holder in violation of

obviously attempted to define the controlling time period within which violations of both paragraphs one and five must have occurred for purposes of contempt as having begun on August 12, at which time they alleged that the defendant had actual notice of both provisions.

paragraph five. In holding that defendant had not violated the proscription of paragraph one against selling insurance, the trial justice found that while there was evidence showing that defendant had been instrumental in effectuating the reinstatement of lapsed life insurance policies, nevertheless reinstatement of lapsed insurance policies was not equivalent to selling insurance. Thus the trial justice denied and dismissed plaintiff's motion to adjudge defendant in contempt. The plaintiff appeals from this decision.

We believe that plaintiff has presented four issues for resolution in this appeal: (1) whether a person can be held in contempt for violation of a proscription of an oral order of a preliminary injunction when the preliminary injunction, which became effective at the same time, does not contain that proscription; (2) whether there was sufficient evidence before the trial justice to establish that defendant had contacted, counseled, or advised program participants in violation of paragraph five of the amended preliminary injunction after he became bound by the amendment; (3) whether there was sufficienct evidence before the trial justice to establish that defendant had sold insurance in violation of paragraph one of the preliminary injunction; (4) assuming defendant did not violate the express terms of the preliminary injunction prohibiting the sale of insurance, whether defendant violated the spirit of the preliminary injunction by reinstating the lapsed life insurance policies. We will address the issues separately.

I

The first issue focuses on the time period between August 12 and November 24, and concerns the effect that the omission of paragraph five from the original preliminary injunction has on our characterization of that conduct of defendant between those dates which was allegedly contumacious in light of paragraph five. We wish to emphasize that this is not a case where there was a violation of an oral order of a preliminary injunction prior to the time a prelim-

inary injunction containing the same terms was issued. Nor is this a case where an oral order was entered, violated, and later reduced to writing in such a manner that the violation would no longer be contemnible. In the instant case, the oral order and the preliminary injunction became effective on the same date, August 12, 1975.

The plaintiff argues that because defendant had actual knowledge of the oral order, either by his presence at the time it was read into the records or by communication from his attorney, he was bound by the terms of that order. Under this theory, paragraph five would be part of the preliminary injunction from the date it was ordered orally, August 12. This proposal would result in the imposition of a burden on defendant to have discovered the discrepency between the order and the preliminary injunction, and to have honored the proscriptions of both for fear of a possible contempt citation for violation of any of their overlapping provisions or any provisions unique to only one. We do not believe that the law dictates such a harsh result.

The general rule is that to be enforceable by a contempt proceeding, an injunction must be clear and certain, and its term must be sufficiently detailed to enable one reading the injunctive order to understand therefrom what he may not do thereunder. *School Committee* v. *Pawtucket Teachers' Alliance, Local No. 930*, 117 R.I. 203, 365 A.2d 499 (1976); *Sunbeam Corp.* v. *Ross-Simons, Inc.*, 86 R.I. 189, 134 A.2d 160 (1957). These requirements are codified in Rule 65(d) of both the Rhode Island and Federal Rules of Civil Procedure by means of the following language: "Every order granting an injunction * * * shall be specific in terms; [and] shall describe in reasonable detail the act or acts sought to be restrained * * *." Discussing this language as it appears in Fed. R. Civ. P. 65(d), the United States Supreme Court has stated that specificity and detail are required "[b]ecause of the rightly serious view courts have traditionally taken of violations of injunctive orders, and because of the severity of

punishment which may be imposed for such violation * * *." *Pasadena City Board of Education* v. *Spangler*, 427 U.S. 424, 439, 96 S. Ct. 2697, 2706, 49 L. Ed. 2d 599, 610 (1976).

Thus there is a certain amount of sanctity with which courts view the express terms of an injunctive order. This perspective is consistent with the maxim that equity speaks through decrees and that the entry of a decree is a necessary precondition to an appeal in an equity proceeding. *See Pukas* v. *Pukas*, 104 R.I. 542, 543, 247 A.2d 427, 428 (1968). Clearly a person may be bound by the terms of an oral injunctive order. However, it is equally clear from our Rhode Island statutes that a written injunction must be given exclusive effect as compared to the oral order of that injunction when the former, with respect to the latter, is made effective the same day, addressed to the same person, and yet contains different terms. A preliminary injunction issued pursuant to Super. R. Civ. P. 65 is appealable under §9-24-7.[5] Because it is appealable, such a preliminary injunction constitutes a judgment under Super. R. Civ. P. 54, which defines "judgment" to include "any order from which an appeal lies." Rule 58 of the Superior Court Rules of Civil Procedure requires that all judgments "be set forth on a separate document." Quite clearly then a written preliminary injunction is contemplated by our rules and statutes as controlling for purposes of our assessment of conduct which is allegedly contumacious in violation of a preliminary injunction.

This disposition is also in harmony with the serious nature with which we must interpret the terms of an injunction, while bearing in mind the severity of the punishment that may be imposed by a court in a contempt proceeding. Our requirements is simply that when a preliminary injunction is set forth in a writing, given the sanctity we must accord any

---

[5]Section 9-24-7 provides in pertinent part: "Whenever upon a hearing in the superior court an injuction shall be granted * * * by an interlocutory order of judgment * * * an appeal may be taken * * * to the supreme court * * *."

construction of the terms of such a writing and the require-
ments of specificity and detail which we must insist upon in
examining allegedly contumacious conduct in the face of
such a written injunctive order, it would be anomalous and
unfair to hold a person to any terms not captured in the
written order. Thus we must conclude that the trial justice
was correct when, in evaluating the conduct of the defendant
up to the time when the amended preliminary injunction
became effective, he consulted the terms of the written order
of August 12 and not the oral order of that same date. Whether
defendant had actual notice of the oral order is irrelevant
because the orders were entered the same day, and as we
have explained, the written order constitutes the judgment in
this case.

## II

Having decided above that defendant was not bound by
the proscription of paragraph five against contacting,
counseling, or advising program holders until he received
notice of the amended order of November 24, we next turn to
plaintiff's contention that the trial justice overlooked
material evidence in determining that defendant had not
violated these terms.

In concluding that there was not sufficient evidence to
prove that defendant violated paragraph five after he had
received notice of the November 24 amendment, the trial
justice considered the testimony of Mrs. Jean Toppa, who
testified that she had been contacted by Mrs. Eckert
sometime around the beginning of December 1975. The trial
justice felt that this was not sufficient to prove that defendant
had violated paragraph five after he knew or should have
known of its contents. This allowed for a reasonable time for
notice of the injunction to reach defendant. The trial justice
fixed the reasonable time for notice as "sometime between
November 24th and December 2nd."

When the parties to an action submit the law and the facts
of the controversy to a trial justice sitting without a jury, as in

the instant case the factual findings of the trial justice are entitled to great weight and will not be disturbed by this court on appeal unless it can be shown that such findings are clearly wrong or that the trial justice misconceived or overlooked material evidence. *Ambrosino v. Bevilacqua,* 118 R.I. 369, 375 A.2d 404 (1977); *Raheb v. Lemenski,* 115 R.I. 576, 350 A.2d 397 (1976).

Additionally, there must be clear proof of a violation of an injunction in order to adjudge a person in contempt of that decree. *Kennedy v. Frechette,* 126 A. 641 (R.I. 1924).

While the testimony of Mrs. Toppa is some evidence indicating that defendant had contacted a program holder after November 24, there is no evidence in the transcript establishing either the date defendant had received actual notice of the amended order of November 24 of the fact that defendant contacted Mrs. Toppa after receiving such actual notice. In making his finding, the trial justice weighed very thoroughly the evidence before him. He ruled that plaintiff had not sustained the burden of introducing clear proof of a violation of the injunction. We agree and conclude, therefore, that the finding by the trial justice that defendant had not violated paragraph five of the amended order after he had actual notice of that provision was not clearly wrong, and that in making that finding the trial justice did not misconceive or overlook any material evidence.

### III

The plaintiff's third ground for appeal concerns the issue whether it was error for the trial justice to find that defendant had not violated paragraph one of the preliminary injunction, which prohibited defendant from selling insurance. Essentially, we are asked to decide if the trial justice was incorrect when he ruled that reinstating a lapsed insurance policy is not the same as selling insurance.

There is substantial evidence in the transcript that defendant advised program holders who had originally purchased life insurance policies from him to convert the

term insurance they had bought under the program back to the original life insurance policies purchased from defendant by reinstating the latter policies. There is also evidence showing that at defendant's behest some of these parties did reinstate their lapsed policies. The trial justice ruled that reinstatement of an insurance policy is not tantamount to a sale of insurance because the former does not result in a new insurance policy, but rather involves a restoration of all benefits accruing to the policy-holder under the original policy. *See Missouri State Life Insurance Co.* v. *Jensen,* 139 Okla. 130, 281 P. 561 (1929). We agree with this analysis.

Generally, "sale" is a word of precise legal import that connotes the formation of a contract under which the seller, in consideration of payment or the promise of payment, transfers to the buyer title and possession to property. *Butler* v. *Thomson,* 92 U.S. 412, 23 L. Ed. 684 (1875). Under this definition of a sale is evidenced by the formation of a contract and by an exchange of rights to property.

The resolution of the issue of whether the reinstatement of an insurance policy is a sale of insurance turns largely on whether the right to reinstatement was reversed or created in the original policy, or whether the reinstatement was purely voluntary on the part of the insurer. 17 *Couch, Cyclopedia of Insurance Law* §§69:29 69:38 (2d ed. Anderson 1967). Where the right to reinstatement flows from a provision in the original policy, the effect is merely to continue or revive the original contract for insurance. *Funk* v. *Franklin Life Insurance Co.,* 392 F.2d 913 (7th Cir. 1968); *Bruegger* v. *National Old Line Insurance Co.,* 387 F. Supp. 1177 (D. Wyo. 1975); *Miller* v. *Mutual Benefit Health & Accident Association of Omaha,* 76 N.M. 455, 415 P.2d 841 (1966). In that instance no new contract for insurance is forthcoming, and therefore there would be no "sale" within the general definition we have formulated because there is neither a new contract nor an exchange of rights, but simply a renewal of already existing rights as guaranteed by the original contract of insurance.

Some jurisdictions hold that reinstatement involves a contract for reinstatement that is distinct from the original contract for insurance, but even those jurisdictions perceive the result as the revival of the terms of the original insurance policy and not the formation of a new contract of insurance. *E.g., American Bankers Insurance Co. v. Farley,* 403 S.W. 2d 545 (Tex. Civ. App. 1966); *cf. Feder v. Bankers National Life Insurance Co.,* 100 N.J. Super. 458, 242 A.2d 632 (1968). *See generally* 1 *Appleman, Insurance Law and Practice* §320 at 577 (rev. ed. 1965). We have followed this rule in *Wholey v. Columbian National Life Insurance Co.,* 69 R.I. 254, 32 A.2d 791 (1943). *Wholey* involved reinstatement of a lapsed insurance policy that provided for reinstatement as a contracutal right. We held that even though the premiums were to be greater after reinstatement than they were under the lapsed policy, nevertheless a new contract for insurance was not formed. *Id.* at 266-67, 32 A.2d at 796-97. Thus under the *Wholey* rule, even where new terms result from the reinstatement, a contract for reinstatement does not necessarily involve a contract for a new insurance policy and thus under our definition of "sale" could not be deemed a sale of insurance.

Where reinstatement is voluntary on the part of the insurer, the reinstatement constitutes a new contract of insurance. *Johnson v. Life Insurance Company of Virginia,* 169 So. 159 (La. App. 1936); 17 *Couch, Cyclopedia of Insurance Law* §69:38 (2d ed. Anderson 1967).

Unless the evidence is undisputed, whether a person has a contractual right to reinstate the policy or whether the insurer has the right to reinstate the policy are questions for the finder of fact. *Id.* §§69:9, 69:11. In the case at bar, there is evidence that defendant contacted program holders and advised them to cancel the insurance they had purchased under the leverage funding program and to reinstate the policies originally sold to them by defendant. However, there is no evidence on the record which shows or would tend to show that reinstatement in these instances was at the discre-

tion of the insurer, Pacific Fidelity Life Insurance Company. Absent such evidence, we cannot conclude, even though insurance was reinstated by virtue of the acts of defendant, that such reinstatement was equivalent to the sale of insurance. Thus we find no error in the finding by the trial justice that defendant did not violate paragraph one of the injunction.

## IV

The plaintiff's final contention is that even if defendant did not violate the express letter of paragraph one, he violated its spirit in a contumacious manner. Inherent in this argument is the premise that defendant should have been aware that the thrust of the injunction was to protect Rhode Island residents from *any* further dealings with defendant, and that in this respect a reinstatement was as harmful as a sale.

Many courts have been willing to waive the requirement that injunctions must be strictly construed where they felt that strict construction would render the injunction ineffectual. *See, e.g., McComb,* v. *Jacksonville Paper Co.,* 336 U.S. 187, 69 S. Ct. 497, 93 L. Ed. 599 (1949). Such courts reason that in deciding whether an injunction has been violated, it is proper to observe the objects for which relief was granted and to find breach of the decree in the violation of the spirit of the injunction even though its strict letter may not have been disregarded. *Rosenstiel* v. *Rosenstiel,* 278 F. Supp. 794 (S.D.N.Y. 1967); *Folk* v. *Standard Business Forms, Inc.,* 270 F. Supp. 147 (W.D.N.C. 1967); *Movers Conference of America* v. *United States,* 251 F. Supp. 882 (S.D. Cal. 1966). The rationale for this rule of construction is that a party bound by an injunction cannot avoid its affect on merely technical grounds or see how close he can come with safety to that which he was enjoined from doing. *AMF Inc.* v. *International Fiberglass, Co.,* 469 F.2d 1063 (1st Cir. 1972); *United States* v. *Christie Industries, Inc.,* 465 F.2d 1002 (3rd Cir. 1972).

However, the message of Rule 65 seems unequivocal, and we believe that the best rule of construction concerning injunctions is that enunciated by Mr. Justice Frankfurter in his dissent in *McComb* v. *Jacksonville Paper Co.,* where he stated:

> "Obedience must of course be secured for the command of a court. To secure such obedience is the function of a proceeding for contempt. But courts shoud be explicit and precise in their commands and should only then be strict in exacting compliance. To be both strict and indefinite is a kind of judicial tyranny." 336 U.S. at 195, 69 S. Ct. at 501, 93 L. Ed. at 606.

This rule would place the burden of specificity on the drafters of injunctions, i.e., the courts and counsel for those seeking the court's order, such as the state in this case. This burden would require precision when describing forbidden conduct because precision is required of those bound by such orders.

As we have mentioned earlier in reference to the injunction before us, "sale" is a term of precise legal meaning. We do not think it is the province of this court in a contempt proceeding to insist that any construction be given to that term other than that we have set forth in this opinion. To rule otherwise would, in Mr. Justice Frankfurter's words, be judicial tyranny, and we shall not sit as tyrants.

The plaintiff's appeal is denied and dismissed, and the order appealed from is affirmed.

*Julius C. Michaelson,* Attorney General, *Gregory L. Benik,* Special Assistant Attorney General, for plaintiff.

*Samuel. A. Olevson,* for defendant.